## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| TEKNEK, LLC, | ) | Case No. 05 B 27545 |
| | ) | |
| Debtor. | ) | Judge Jacqueline P. Cox |
| | ) | |

### MEMORANDUM OPINION
#### on
#### "Motion of System Division, Inc. for an Order of Contempt Against Debtor and Sheila Hamilton Pursuant to 11 U.S.C. § 105, Fed. R. Bankr. P. 9020 and 9014"

Before the Court is the "Motion of System Division, Inc. for an Order of Contempt Against Debtor and Sheila Hamilton Pursuant to 11 U.S.C. § 105, Fed. R. Bankr. P. 9020 and 9014." System Division, Inc. ("SDI") is a creditor in the Chapter 7 bankruptcy case of Teknek LLC. SDI asserted what in substance are grounds for holding the debtor Teknek LLC; the debtor's member, officer, and designated representative for purposes of this bankruptcy case, Sheila Hamilton; and the debtor's legal counsel Coman & Anderson, P.C. in contempt of court: 1) for failure to provide a date certain for the Bankruptcy Rule 2004 examination of the debtor's member Jonathan Kennett; 2) for failure to provide SDI with the actual computer server in Scotland that had been used and accessed when the debtor was operating and, relatedly, failure to notify SDI prior to traveling to Scotland to obtain forensic-expert examination of this server that the server that would be produced under court order would currently house no actual business data concerning the debtor; 3) destruction and/or alteration of evidence by overlaying a new operating system in the computer at issue only one day after entry of the court order granting SDI access to it; and 4) failure to supply certain requested discovery

1

documents, including customer and vendor lists and codes. SDI withdrew the first ground from contention after Kennett appeared for his scheduled deposition in January, leaving three grounds.

As a preliminary matter, the Court must address the testimony of A.J. Poyer, a former employee of SDI's counsel, Freeborn & Peters LLP. SDI produced him as a witness and conducted direct examination of him at the original hearing; SDI had a duty to bring him back to the continued hearing so that the debtor's counsel could cross-examine him. Freeborn & Peters terminated Poyer's employment between these two hearings and then, upon appearing on the date of the continued hearing, asserted that it could no longer control and direct Poyer as a nonemployee. SDI, by and through Freeborn & Peters, contended that the debtor would have to subpoena Freeborn & Peters' former employee if it wished to cross-examine him. Cross-examination is a fundamental aspect of civil trials, as the entire hearsay rule of evidence is based on the notion that a witness ought to be present so that a party's opponent may cross-examine him. When you add to this principle the fact that Poyer was Freeborn & Peters' witness, not the debtor's, it becomes apparent that SDI, by and through Freeborn & Peters, needed to subpoena Poyer to compel his attendance, not the debtor. Accordingly, Poyer's testimony is hereby stricken from the record.

### Discussion and Analysis

The character of a contempt proceeding, including – most importantly, the nature of the remedy sought – determines whether a contempt proceeding is civil or criminal, which in turn determines the type of relief a federal court may award. *Penfield Co. of Cal. v. Securities and Exchange Commission*, 330 U.S. 585, 67 S.Ct. 918, 924 & n.5 (1947) (Rutledge, J., concurring); *see also id.* at 921. One determines the character of the proceeding by considering four things:

2

the nature of the relief sought, "the private or public character of the complainant, whether or not

the contempt proceeding arises in and as corollary to civil litigation, and the necessity for

observing distinct procedural requirements in the course of trial" (such as Rule 42(b) of the

Federal Rules of Criminal Procedure). *See id.* at 924 & n.5, 927 (Rutledge, J., concurring)

(applying the rule of *Gompers*). The final three unequivocally point to civil contempt in this

case: the complainant is a private company; the proceeding arises as a corollary to a civil

bankruptcy case; and criminal-procedure rules have not been observed. SDI has nevertheless

sought compensatory damages and coercive sanctions in addition to unconditional, punitive

fines. Incidentally, a federal district court may at times entertain a single proceeding for the

prosecution of both civil and criminal contempt, with both types of relief available in the mixed

proceeding. *See id.* at 927 (Rutledge, J., concurring) (citing *United Mine Workers*). In such a

proceeding, any resulting hybrid order imposing both civil and criminal sanctions is reviewed

under criminal-conviction-review procedures. *See id.* at 921. Bankruptcy courts, however, have

no subject matter jurisdiction over criminal proceedings under Title 18 generally, 28 U.S.C. §

157 & § 1334(a)-(b); *In re Szabo Contracting*, 283 B.R. 242 (Bankr. N.D. Ill. 2002), or over

criminal-contempt proceedings specifically, *Yaquinto v. Greer*, 81 B.R. 870, 879-81 (N.D. Tex.

1988). Thus, this Bankruptcy Court may not enter orders granting remedies that are criminal in

nature or are of a hybrid nature.

Pursuant to the inherent and statutory civil-contempt powers that bankruptcy courts do

possess, *see* 1 *Collier On Bankruptcy* ¶ 3.09[2], at 3-110 to -113 (Alan N. Resnick & Henry J.

Sommer eds., 15th ed. rev. 2006); *compare* 11 U.S.C. § 105(a); Fed. R. Bankr. Pro. 9020, the

Court may fashion remedies to compensate those injured by a debtor's failure to abide by court

orders and to coerce future compliance with such orders, *see* 1 *Collier On Bankruptcy, supra,* ¶

3.09[2], at 3-111; *see also Portland Feminist Women's Health Center v. Advocates for Life*, 877

F.2d 787, 790 (9th Cir. 1989). Civil contempt serves the complainant's interests by remedying

the disobedient conduct, while criminal contempt vindicates the public's interest by deterring

future offenses to the Court. *Penfield Co. of Cal. v. Securities and Exchange Commission*, 330

U.S. 585, 67 S.Ct. 918, 921 (1947). As part of a civil contempt judgment, a court can impose

fines payable to the court or imprisonment as long as the sanctions are remedial and prospective

in nature – that is, as long as the contemnor may avoid paying them by complying with the court

order. *See id.* at 921-23; *Powers v. Chicago Transit Authority*, 846 F.2d 1139, 1141 (7th Cir.

1988). Civil contempt more often sanctions tomorrow's contumacious behavior (at least when

they are noncompensatory), while criminal contempt punishes yesterday's. *Penfield*, 330 U.S.

585, 67 S.Ct. at 923. Thus, unconditional fines, even of relatively small amounts, penalize past

conduct and are not available in civil-contempt proceedings. *See id.* at 921-23. As the Eleventh

Circuit stated:

> Sanctions are coercive if they serve the complainant rather than vindicate some
> public interest. *Penfield Co. v. Securities & Exchange Commission*, 330 U.S. 585,
> 590, 67 S.Ct. 918, 921, 91 L.Ed. 1117 (1947). Sanctions are also coercive if the
> contemnor has the ability to control the extent of the sanction. *See Penfield*, 330
> U.S. at 590, 67 S.Ct. at 921 ("One who is fined, unless by a day certain he
> produces the books, has it in his power to avoid any penalty. And those who are
> imprisoned until they obey the order, 'carry the keys of their prison in their own
> pockets.' "); *see also Local 28, Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478
> U.S. 421, 444, 106 S.Ct. 3019, 3033, 92 L.Ed.2d 344 (1986) ("[P]etitioners could
> purge themselves of the contempt by ending their discriminatory practices and by
> achieving the court-ordered membership goal; they would then be entitled ... to
> recover any moneys remaining in the Fund."); *Shillitani v. United States*, 384 U.S.
> 364, 371, 86 S.Ct. 1531, 1536, 16 L.Ed.2d 622 (1966) ("[T]he justification for
> coercive imprisonment as applied to civil contempt depends upon the ability of
> the contemnor to comply with the court's order."); *Southern Railway Co. v.*

4

*Lanham*, 403 F.2d 119, 124 (5th Cir.1968) (Unconditional fine is punitive in
nature because "[i]t does not permit appellant to purge itself and remove the
sanction by compliance with the court's discovery order.").
In discussing the civil and criminal sanctions for indirect contempt (i.e.,
contemptuous acts that occur out of the court), the Supreme Court explained:
The paradigmatic coercive, civil contempt sanction ... involves confining a
contemnor indefinitely until he complies with an affirmative command such as an
order to pay alimony . . . .

*Jove Engineering, Inc. v. I.R.S.*, 92 F.3d 1539, 1558 (11th Cir. 1996).

"The standard for finding a party in civil contempt is well settled: The moving party has

the burden of showing by clear and convincing evidence that the contemnors violated a specific

and definite order of the court." *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir.

1999); *see also Jones v. Clinton*, 36 F.Supp.2d 1118, 1126 (E.D. Ark. 1999).

## II. SDI's First Basis for Claiming Contempt: Teknek LLC's Alleged Failure to provide SDI with the actual computer server used and accessed when the debtor was operating

The first of the three grounds SDI asserts is the debtor's and Hamilton's failure to provide

SDI with the actual computer server in Scotland that had been used and accessed when the debtor

was operating and, relatedly, failure to notify SDI prior to traveling to Scotland to obtain

forensic-expert examination of this server that the server to be produced under court order would

currently house no actual business data concerning the debtor. The court order that serves as the

source of this potential basis for contempt is the November 17, 2005, order mandating that the

"Debtor . . . provide SDI or its designated representative access to all computers or servers in

Scotland or wherever else located which were used or accessed by the Debtor at any time during

its operations." The basis for the contention is the report and testimony of the computer forensic

expert SDI hired to travel to Scotland to copy and examine the debtor's former computer's hard

drive, which indicated that the day after the order was entered, or November 18, 2005, an

5

employee at Teknek Holdings in Scotland installed a new operating system over the Windows

2003 operating system that had been installed in May 2005 (two months prepetition) over

whatever other operating system the debtor had used up until autumn 2004. Although the

forensic expert recovered 757 files deleted during the span from May 2005 through November

2005, he explained that the overlay of the third operating system in November 2005 had a

known, high probability of destroying the information stored from May until November. He

further stated, however, that the information that had been stored during that time period and

then potentially destroyed in November 2005 was not the live business data of the debtor Teknek

LLC. This last conclusion of course makes sense considering all the other allegations in both the

bankruptcy case in chief and the associated adversary proceeding to recover fraudulent

conveyances: The debtor has not been a formally operating entity with ongoing sales since June

2004 because its core business operation shifted to Teknek America that June and then to Tekena

USA in September 2005 – transfers being scrutinized as potentially fraudulent transfers in a

separate adversary proceeding. SDI's forensic expert furthermore established neither that the

debtor's business data existed on this hard drive nor that the November 2005 operating-system

overlay destroyed any such files *during the time the bankruptcy case has been pending.* SDI uses

these conclusions to contend that the debtor and Hamilton did not comply with the November 17,

2005, order because the computer turned over in Scotland was not a computer that had been

"used or accessed by the Debtor at any time" under the order.

The debtor and Hamilton use the above conclusions of SDI's expert in conjunction with

the testimony of Mr. MacKillop to explain how the server provided in Scotland was in fact the

only remaining computer server "used or accessed by the Debtor at any time." MacKillop

6

explained that the debtor had previously "used or accessed" two computer servers. Upon ceasing

operation in 2004, the debtor transferred them to Teknek Electronics in 2004, and when the first

one, a file and print server, became "redundant technology," Teknek Electronics disposed of it in

accordance with environmental policies well before this bankruptcy case was filed. That server

purportedly did not house the debtor's financial data long term. The debtor continued accessing

the second one until autumn of 2004, when one of several hard drives failed. At that time, one of

the "Teknek" entities in Scotland archived all data contained on the second server and pertaining

to the then-dormant debtor onto a compact disc of databases readable using a Concorde software

application. This entity continued using, for "development and testing" purposes, this only

remaining computer previously used or accessed by the debtor. Then during May 2005,

approximately six months later, this "Teknek" entity in Scotland installed a new Windows 2003

operating system. Next, Teknek LLC filed the instant Chapter 7 case on July 12, 2005, and this

Court entered the described order at issue on November 17, 2005, one day before the other

"Teknek" entity in Scotland overlaid yet another operating system, this time in Linux. Teknek

Holdings purportedly installed the Linux operating system on the debtor's former server as way

to find a possible method of reducing the spam on the company's e-mail system. Hamilton

turned the CD of highly detailed, archived data over to SDI and the trustee on November 1, 2005.

Thus, according to this account and explanation, the server provided to SDI's representative was

the actual server that had  been used and accessed by the debtor; the archived data from the

debtor had already been disclosed; the exact same business data in computer-hard-drive form had

already been destroyed or compromised two months prepetition; and finally, the Linux operating

system installation did not destroy any of the debtor's business data in November 2005, since the

debtor was no longer maintaining and entering live business data on the sole remaining server it had "used or accessed."

This account and its evidentiary basis pose a real obstacle for SDI's contempt theory. SDI must show with clear and convincing evidence that the debtor or Hamilton violated a definite and specific court order, yet this account indicates that the debtor and Hamilton did in fact provide the only remaining computer server "used or accessed by the Debtor at any time." SDI's arguments implicitly read various representations and warranties concerning what is or should be on the debtor's former server into the order, but those representations and warranties are simply not present.  Plus, SDI drafted the court order, so it should be strictly construed as to SDI instead of being liberally construed to include unstated conditions.  Even if the Court were to find the MacKollip testimony less than credible and the timing of the November 18 events highly circumspect, SDI still would not meet its evidentiary burden of showing that some other server was the one used or accessed by the debtor and not the one provided to the forensic experts.  (No court order could have existed prepetition when the May 2005 operating-system overlay occurred.)

On this first ground, SDI has a related theory of recovery stemming from the fact that it incurred $22,610 in expenses to have the forensic experts find and analyze the debtor's former server in Scotland, while the debtor and Hamilton were aware that the computer to be provided overseas would have no current business data pertaining to Teknek, LLC.  While the cause for outrage here is obvious, the same problem with SDI's legal theory just identified persists:  the cause for outrage must be linked to a violation of a specific and definite court order, which thus far has not been established.  SDI's arguments presume over and over that the debtor and

8

Hamilton had a legal duty to explain in advance the present condition of the server that the debtor had "used or accessed," but it has never cited any firm authority for a duty of disclosure that accompanies a duty to meet discovery requests with technically responsive productions. Moreover, SDI contributed to the difficult position in which it found itself. After receiving the CD of detailed, archived business data at Hamilton's deposition on November 1, 2005, SDI assumed that the CD was worthless instead of engaging in the communication required to learn that the Concorde software application would have permitted it to read and analyze a substantial production of data. As is often true in difficult cases, the failure to communicate in this case went both ways. Had SDI learned the content of the CD prior to November 17, 2005, it could have engaged in a cost-benefit analysis of whether any additional information was worth the effort of having computer forensic experts retrieve the hard drive associated with the CD from an overseas affiliate. The general rule is that the expenses of engaging in and carrying out this type of cost-benefit analysis are bourne by the respective parties. Had SDI weighed its options with full knowledge of the content of the CD and with a higher level of communication and still found itself desperate for hard data on a debtor who appeared to be hiding something, it would then have a more compelling cause for outrage and, perhaps, discovery sanctions under Bankruptcy Rule 7037.

The Court finds no liability on the first ground for contempt. No liability having been found, the Court finds it unnecessary to bring the debtor's attorneys into the fray on this issue, as SDI requested. In any event, a heightened standard for deposing an opposing party's attorney would have required showings that "'[n]o other means exist to obtain the information other than to depose opposing counsel'" and that "'the information is crucial to the preparation of the case'"

in addition to overcoming assertions of privilege to particular questions. *Hernandez v. Longini*, 1997 WL 754041, at \*5 (N.D. Ill. 1997) (quoting *Shelton v. American Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir.1986)). *But see Qad.inc v. ALN Associates*, 132 F.R.D. 492, 495 (N.D. Ill. 1990).

### III. SDI's Second Basis for Claiming Contempt: destruction and/or alteration of evidence

The second of three grounds SDI asserts is the debtor's alleged destruction and/or alteration of evidence of the debtor's financial condition by means of overlaying a new operating system in the computer at issue only one day after entry of the court order granting SDI access to it. As the legal basis for the contempt finding, SDI relies in part on the following provision:

> § 152. Concealment of assets; false oaths and claims; bribery
> A person who--
> . . .
> (8) after the filing of a case under title 11 or in contemplation thereof, knowingly and fraudulently conceals, destroys, mutilates, falsifies, or makes a false entry in any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor; . . .
> shall be fined under this title, imprisoned not more than 5 years, or both.

18 U.S.C. § 152.

There are at least three problems with this theory of relief. The first problem is that what SDI is really requesting is an unconditional fine to punish the debtor and/or Hamilton for tampering with evidence, i.e., for past conduct. If the data is already destroyed, any inability to repair or recover it would not lend itself to a sanction conditioned on future compliance. As explained above, a remedy which by its nature is a criminal-contempt remedy is not within the subject matter jurisdiction of bankruptcy courts. This limitation does not go away by importing the bankruptcy-crimes statute, over which this Court likewise has no subject matter jurisdiction.

It goes without saying that the Court does not condone tampering with evidence pertaining to a bankruptcy debtor's financial history, but other civil and criminal laws must do the job of addressing such conduct, including the one cited above. Civil contempt is not a good fit because the complainant must prove that an alleged contemnor has disobeyed a specific and definite court order, and standing orders to refrain from modifying or altering debtors' hard drives do not exist in each and every case.

Even if the Court were to apply the above statute, SDI failed to establish as a factual matter that the debtor or Hamilton engaged in postpetition tampering with actual recorded information relating to Teknek LLC's property or financial affairs on the computer server at issue. The 757 deleted files that would have eventually become unrecoverable as a result of the November 2005 operating-system overlay were not files that the debtor itself had created or maintained during the prior six months. The debtor's historic information had already been wiped out by the prepetition, May 2005 operating-system overlay, and even at that time, the debtor was essentially no longer engaged in activities requiring entry of business data, having transferred its goodwill and core business to Teknek America. (This is the gravamen of the adversary proceeding.) Additionally, the debtor and Hamilton turned over the archived version of the same data to SDI on November 1, 2005.

It is at least conceivable that the prepetition, May 2005 operating-system overlay was "in contemplation" of the July 12, 2005, Chapter 7 filing and that it represented a purposeful attempt to destroy some additional data not recorded in some other medium and produced in the bankruptcy so far. That issue is not only outside the scope of what this Court may do in a civil-contempt proceeding tied to the pendency of the actual bankruptcy case, but it is also outside the

11

scope of the civil bankruptcy laws that it may generally adjudicate under Title 11.

The Court finds no liability on the second ground for contempt.

### III.  SDI's Third Basis for Claiming Contempt:  failure to supply certain requested discovery documents, including customer and vendor lists and codes

The third of the three grounds SDI asserts is the debtor's failure to supply certain requested discovery documents, including customer and vendor lists and codes.  Apart from the vendor and customer lists and codes addressed below, SDI has asserted certain general grievances that various types of requested documents have not been produced.  The debtor and Hamilton demonstrated how the CD of financial data produced on November 1, 2005, contained hundreds of pages worth of detailed day-by-day transaction data.  This underlying data was, according to the debtor, summarized to spreadsheet printouts for accounts receivable, accounts payable, profit and loss statements, and balance sheets that Hamilton produced on the November 1 examination date, having printed these spreadsheets from an Excel application on October 24, 2005.  SDI has failed to show and explain with clear and convincing evidence precisely what is missing (other than the customer and vendor codes).  The Court finds no basis for contempt based on some general failure to produce documents or data at this point in time.

With respect to the customer and vendor codes and lists, the subpoena at issue in this matter serves as a clear and definite court order.  It required Hamilton to produce documents, writings, computerized records, books, summaries, and/or reports containing the debtor Teknek LLC's financial statements, balance sheets, profit and loss statements, accounts receivable, accounts payable, "including specific information as to name, address, contact person and phone number for each vendor, creditor or customer," from January 1, 2000, to the present.  Schedule A

12

to subpoena, at p. 2, ¶ 5.  It is undisputed that neither the debtor nor Hamilton have turned over the debtor's detailed listing of the identities of its former vendors and customers.

Creditors have a federal interest and right in obtaining certain historical information and data from a debtor before asking them to eat their losses.  This interest is embodied in § 521(4) of the Bankruptcy Code, which provides that "[t]he debtor shall . . . surrender to the trustee all property of the estate and any recorded information, including books, documents, records, and papers, relating to property of the estate, whether or not immunity is granted under section 344 of this title."  11 U.S.C. § 521(4) (2005 Norton Quick-Reference Pamphlet) (emphasis added).  The debtor Teknek LLC (as opposed to Hamilton) contends that it is impossible for the debtor to comply because it did not have possession, custody, or control over the customer and vendor lists and codes from and after the time that Teknek Electronics in Scotland revoked its license to use and possess such information in May 2004.  SDI counters that because Hamilton is both an interest holder and officer with respect to both the debtor and Teknek Electronics' successor, the Court should find that the debtor – through Hamilton – does have control over the information and find it in contempt for not disclosing it.

While SDI's disregard-corporate-form argument would essentially require some form of formal veil piercing to be valid as to the debtor (something that has not yet occurred in this bankruptcy),[1] the Court need not go that far to award a version of the relief requested.  Other

_____

[1] A power similar, though not identical, to veil piercing apparently exists in situations in which affiliated corporations maintain affairs that are so intertwined and interdependant that a federal court may cause an order or decree to run against an affiliated corporation.  As the Supreme Court once stated:

> But we think the Board is entitled to show that these separate corporations are not what they appear to be, that in truth they are but divisions or departments of a 'single enterprise.'  That is the alternative theory of liability which the Court of Appeals did not consider.  We think that the Board is entitled to a hearing on that alternative theory and to discovery in aid of it.

13

legal provisions render resort to formal veil piercing unnecessary.  Dovetailing with § 521(4) is

11 U.S.C. § 542(e), which states, "Subject to any applicable privilege, after notice and a hearing,

the court may order an attorney, accountant, or *other person that holds recorded information,*

including books, documents, records, and papers, *relating to the debtor's property or financial*

*affairs,* to turn over or disclose such recorded information to the trustee." *Id.* (emphasis added);

*see also* Fed. R. Bankr. Pro. 2004(b)-(c) (extending subpoena power to compel examination of

*nondebtor entities* and production of their documents relating "to the acts, conduct, or property or

to the liabilities and financial condition of the debtor").  This codified federal interest in

disclosure of information *from third parties* holding the information of companies requesting

federal bankruptcy protection is not so easily trumped by a mere contractual interest asserted by

an affiliated company in the same books, records, documents, and papers.  Any sensitive portion

---

The question whether the corporations under Weiner's ownership were only departments or divisions in one single enterprise is in a different category than those that arise under either 13 Eliz. or the modern law of preferences. Whether one corporation is liable for the obligations of an affiliate turns on other considerations. The insulation of a stockholder from the debts and obligations of his corporation is the norm, not the exception. *See Pullman's Palace Car Co. v. Missouri Pacific R. Co.,* 115 U.S. 587, 597, 6 S.Ct. 194, 198, 29 L.Ed. 499. Yet as Mr. Justice Cardozo said in *Berkey v. Third Avenue R. Co.,* 244 N.Y. 84, 95, 155 N.E. 58, 61, 50 A.L.R. 599,'Dominion may be so complete, interference so obtrusive, that by the general rules of agency the parent will be a principal and the subsidiary an agent. Where control is less than this, we are remitted to the tests of honesty and justice.' That is not a complete catalogue. The several companies may be represented as one. FN1 Apart from that is the question whether in fact the economic enterprise is one, the corporate forms being largely paper arrangements that do not reflect the business realities. One company may in fact be operated as a division of another;FN2 one may be only a shell, inadequately financed;FN3 the affairs of the group may be so intermingled that no distinct corporate lines are maintained.FN4 These are some, though by no means all,FN5 of the relevant considerations, as the authorities recognize. See Lattin on Corporations (1959) ch. 2, ss 13, 14; Stevens on Corporations (1949) s 17; Berle, The Theory of Enterprise Entity, 47 Col.L.Rev. 343.

*N.L.R.B. v. Deena Artware,* 361 U.S. 398, 402-04, 80 S.Ct. 441, 443-44 (1960).  While the legal authority for consolidating the legal liability of seemingly separate corporations may exist, no formal hearing or trial has addressed the requisite legal standards and the evidence needed to sustain them in this bankruptcy case.  The corporate form cannot be lightly disregarded as a result of casual assertions made in passing during arguments made on another motion.

of this contractual interest constituting a legitimate trade secret could have been asserted as a

good-faith basis to obtain a protective order limiting use of the customer list. Fed. R. Bankr. Pro.

7026(c) & 9016(c)(3)(B). Hamilton did not successfully pursue this legitimate avenue; she

simply withheld the information she had been ordered to produce in the subpoena, though she

had proprietary and managing authority over both the debtor and the nondebtor Teknek entity

holding the subpoenaed information. Therefore, the Court concludes that Hamilton has

disobeyed a specific and definite court order that was lawfully addressed to her as a third party.

Disobedience of subpoenas is subject to civil-contempt remedies just as are other types of court

orders. *E.g., Penfield Co. of Cal. v. Securities and Exchange Commission*, 330 U.S. 585, 67

S.Ct. 918, 919-20 & 923 (1947).

The debtor and Hamilton assert that SDI did not follow the correct procedure for

obtaining contempt relief in that they did not first file a motion seeking an order to compel

production or discovery under Bankruptcy Rule 7037(a) before pursuing civil contempt. There is

some authority for the general proposition that a party should utilize the well-delineated remedies

for discovery violations listed in Bankruptcy Rule 7037 before pursuing more drastic civil-

contempt remedies based on a court's inherent authority to enforce compliance with orders.

*Powers v. Chicago Transit Authority*, 846 F.2d 1139, 1143 (7th Cir. 1988); *Jones v. Clinton*, 36

F.Supp.2d 1118, 1126 (E.D. Ark. 1999). This may well be the correct procedure for the

investigations occurring directly *between two parties* (here a debtor and a creditor), which is

technically what "discovery" refers to. With respect to the subpoena power and *nonparties*,

though, specific authority permits the direct pursuit of contempt-of-court relief. Fed. R. Bankr.

Pro. 9016(e). Additionally, the Court notes that the subpoena that Hamilton has disobeyed was

15

front ended by two motions, two hearings, and two Bankruptcy Rule 2004 orders (one dated

September 20, 2005, and the other October 20, 2005) that specifically stated that Hamilton

herself must produce documents and information listed in a subpoena. (These events also satisfy

the notice and hearing requirements of § 542(e), cited above.) Having SDI bookend the

subpoena with court orders before legitimately being able to pursue contempt would seem to be a

wasteful procedural requirement. The Court will hold Hamilton in contempt of court and impose

a fine of $1000 per day until the customer and vendor lists and codes are supplied to the Chapter

7 trustee's attorney.

　　　　Finally, SDI has requested an award of attorneys' fees to compensate it for having to

bring the instant motion for civil contempt. As part of their inherent power to hold someone in

civil contempt of their orders, federal courts may assess attorneys' fees to compensate the

beneficiary of the disobeyed order. *Chambers v. NASCO,* 501 U.S. 32, 44-45, 111 S.Ct. 2123

(1991); *cf. Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 2573-74 & nn. 14 & 17 (1978). Here,

SDI has presented three grounds for contempt sanctions against both the debtor and Hamilton; a

fourth ground was relatively uncomplicated and was later withdrawn. SDI prevailed on only one

of the three grounds. On the third ground, the Court has found that Hamilton had no legal basis

for withholding certain information specified in the subpoena at issue, and the no-control-or-

possession argument simply holds no water when applied to Hamilton. In the context of the

federal civil-rights statute's fee-shifting provisions, the Supreme Court has instructed district

courts to sever claims that have distinct legal theories and unrelated factual origins and to not

award shifted fees with respect to the unsuccessful, distinct claims that could have been

maintained in a separate civil action. *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 1940-

16

41 & n.12, 1943 (1983); *Jaffee v. Redmond*, 142 F.3d 409, 413 (7th Cir. 1998); *Spanish Action Committee of Chicago v. City of Chicago*, 811 F.2d 1129, 1133 (7th Cir. 1987); *Ustrak v. Fairman*, 851 F.2d 983, 988 (7th Cir. 1988). Even when claims are deemed "related," factually intertwined, or "alternative," the overall success of the litigation is supposed to be a critical factor in awarding shifted fees, with the requested relief being compared to the awarded relief. *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 1940, 1942-43 (1983); *Jaffee v. Redmond*, 142 F.3d 409, 413 (7th Cir. 1998); *Spanish Action Committee of Chicago v. City of Chicago*, 811 F.2d 1129, 1133 (7th Cir. 1987). If the overall success is substantial compared to the case's initial scope, then a straight lodestar calculation is likely appropriate to fully compensate the plaintiff's attorney for devotion to the litigation as a whole, and the defendant will be required to compensate such attorney even for unsuccessful alternative legal theories and for unsuccessful arguments made in furtherance of the successful legal theory (as long as they are reasonable). *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 1940-43 (1983); *Jaffee v. Redmond*, 142 F.3d 409, 414 (7th Cir. 1998); *Spanish Action Committee of Chicago v. City of Chicago*, 811 F.2d 1129, 1133 (7th Cir. 1987). However, if the overall success is limited because a substantial amount of requested relief was denied, a corresponding reduction in shifted fees is in order, even where the interrelated legal theories are nonfrivolous and raised in good faith. *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 1941-43 (1983); *Spanish Action Committee of Chicago v. City of Chicago*, 811 F.2d 1129, 1133-35 (7th Cir. 1987); *Cole v. Wodziak*, 169 F.3d 486, 487-89 (7th Cir. 1999); *Ustrak v. Fairman*, 851 F.2d 983, 988-89 (7th Cir. 1988). In the latter situation, the lodestar method need not be used, and the court may award a shifted fee that is a percentage of the damages recovered, as in tort litigation. *Cole v. Wodziak*, 169 F.3d 486, 487-89

17

(7th Cir. 1999). It is important to note that this reduction must occur *after* a more basic, preliminary reduction for hours that are inadequately documented, redundant, or otherwise unreasonable, excessive, or unnecessary. *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 1939-41 & n.12 (1983); *Spanish Action Committee of Chicago v. City of Chicago*, 811 F.2d 1129, 1137-38 (7th Cir. 1987); *e.g., Ustrak v. Fairman*, 851 F.2d 983, 988 (7th Cir. 1988).

This matter does not fit comfortably into either related claims or unrelated claims. All of the movant's claims have in common the fact that SDI has been trying to uncover business and financial data from a debtor and its principals, who have resisted this effort to some degree. However, the vast majority of this litigation pertained to SDI's overseas search for a hard drive that has not held the data it seeks for the requisite time period, while the claim on which it prevailed pertained to a third party's wrongful withholding of information (regardless of form) maintained by affiliated nondebtor "Teknck" entities. Thus, separate actions and inactions were at issue in the third theory of contempt and thus could have plausibly been the subject of a separate motion for a rule to show cause. Still for all SDI knew, it may have been able to find the customer and vendor codes it sought on the elusive hard drive, so perhaps under applicable precedent the third claim would be deemed "related" to the first two after all. In any event, even the "related" claims in this matter demand that some of the attorney's fees be shifted to Hamilton as part of the civil-contempt remedy while other attorneys' fees be paid by the partially unsuccessful movant SDI. While SDI sought unconditional fines, prospective fines coercing turnover of data, compensatory damages related to discovery efforts for a hard drive in Scotland, implicit findings of corporate-affiliate liability, and authority to depose and implicate the debtor's law firm in the contempt allegations, it only obtained prospective fines coercing turnover of data

18

with respect to one of three claims. Being a limited-success case, the Court will apportion SDI's attorneys' fees between SDI and Hamilton upon submission of a fee application containing detailed billing and expense records showing 1) the total time and costs for prosecuting the motion at issue in this opinion, 2) the portions of those billing records directly pertaining to the successful ground, and 3) any portions of those billing records that were so generally beneficial and necessary to bringing the motion that proration is appropriate. SDI may also include any pre-motion efforts to have Hamilton comply with the portion of the subpoena that is the basis for the contempt finding.

Dated:  May 25, 2006

ENTERED:

_Jacqueline P. Cox_

Jacqueline P. Cox
United States Bankruptcy Judge

19